The Real Party in Interest is America's Most Wanted Is the 15 minutes included with the reply or is that total? That's with reply. I understand. So if you want to reserve some time, just tell us and we'll try to advise you of the time. We'd like to reserve five minutes of time for rebuttal, please. Okay, great. Good morning. Thomas Burke of Davis Wright Tremaine on behalf of STF Productions, the producer of America's Most Wanted. The district court in this case was absolutely correct when it characterized the video outtakes of America's Most Wanted's interviews with two government employees as a big nothing. But the court committed an error, both in fact and law, when it nevertheless released that information in the last order that it issued after 19 months had passed in the case. And what is significant is what happened during that 19 months. And what happened is really what I think should control and should lend an understanding to the court as to why it's not relevant to Mr. Lin's defense. And, in fact, that Judge White was correct when he said it's a big nothing. What happened was when Judge White looked at when Judge White issued his order in 2004, he did so without having reviewed the outtakes. They had not been before him. They had not been before Magistrate Judge Trumbull. He had a footnote in his order in which he invited America's Most Wanted to submit them to him in camera if there was any issue as to their confidentiality. We took him up on that invitation and we submitted them. But before we did, we filed an ex parte application asking for permission. And we asked the court to consider both their relevance as well as the confidentiality because some of the information was submitted, given to America's Most Wanted with an expectation of confidentiality. The court responded to that and issued an order saying that the only issue before it was as to the privilege, not as to whether or not it was relevant. Nineteen months go by and a significant event happens both legally and factually in the case. And, of course, in that 2004 order, the court says in terms of the relevance, citing a U.S. Supreme Court decision and citing a California Supreme Court decision, that in a death penalty case, the facts for the defendant, they may not be exonerating facts, but they are facts that may be of assistance to the defense with respect to that death penalty sentence that they face. Well, Mr. Lynn had a development happen with his case in March of this year. Mr. Lynn, the government decided, was not the person responsible for creating the bomb. Mr. Lynn was also no longer going to be prosecuted and face the death penalty. Do you think there's such a big difference between the death penalty and imprisonment for life? If I were the defendant, I think we'd think it was. And I think it's significant in this case. Anybody might prefer to be put to death than to be imprisoned for life. But what's important, I think, Judge Noonan, is that the law gave a different approach to relevance. Well, they considered the death penalty. Now we're considering life imprisonment, aren't we? That's correct. But the law in the cases that Judge White was referring to, and there was actually Magistrate Judge Trumbull had us have a special briefing on this issue as to whether or not there should be more latitude as to what is admissible at this stage because the defendant faced the death penalty. Let me ask you a procedural question. Yes. In this case, you submitted essentially at the judge's invitation, but you followed up on that and submitted the material on camera. First of all, do you think that's the proper procedure to be followed in criminal cases where there may or may not be relevant information? I think it's the proper procedure where the reporter's privilege is asserted in the case. Okay. And if it is the proper procedure, what is the duty of the court in examining those, that material, in your view? In our view, and we specifically ask that the court review that material both for relevance and for the existence of the privilege. Let's assume that the court had found relevant material. What would be your position on that in terms of disclosure? The question would still be whether or not the balancing test under Schoen applied by Magistrate Judge Trumbull and Judge White was satisfied. So in the abstract, it would be hard to say. Let's assume, for example, that the out tape showed one of the investigating officers saying, well, we really just trumped up this whole case, that admission on tape, which would be obviously highly relevant in a criminal trial. I gather your position would be in balancing, you might say, well, that's something that can be disclosed because in the balance of interest, that goes on the other side of the scale. Would that be your position? That would be evidence of exoneration, which is far and apart from what we have in this case. Right. I believe that the question would still be with respect to 17C whether or not on a pretrial basis they were entitled to get that. Now, if the defense knew for or had a reason to believe, such as in Nixon where they submitted declarations and said, we believe this specific information is in there, it's relevant, it's specific, and it's admissible. Now, for example, that information that somebody who watched the taping said, we heard this admission. Correct. Something like that. Correct. And to be very clear, that does not exist in this case. And we have seen theory after theory after theory march past the courts in this case from jury prejudice to misconduct, prosecutorial misconduct, to the death penalty, now mooted, to the most recent one is that to the extent that the outtakes show any inconsistencies with respect to the government's investigation, that is relevant because they may prove to be inconsistencies which they want to impeach them with. And impeachment on a Rule 17C subpoena, if impeachment is the grounds, that's reversible error. That's an abuse of discretion and reversible error under Fields. And that's what we have here. We have essentially a fishing expedition under Rule 17C which is not allowed, notwithstanding the even more rigorous standard under the reporter's privilege. This is an interview of the former prosecutor on the case. Who is not even a witness at trial. Correct. I'm just giving a description. Yes, Your Honor. I'm not arguing with you in any way. I understand. As I understand it, it's two people. One is the former prosecutor. Correct. One is a former investigator. No. Current investigator. Current investigator. Correct. So the person who worked up the case, the case agent on the case. No, actually, it is. And this is actually very key, again, as to the change in circumstances here. That Judge White's order did not take into appreciation. But, in fact, his comment about the quantum of the evidence did. If you remember at the time of the order before the outtakes are viewed by Judge White, Mr. Lynn is facing a theory and death penalty, a theory that he built the bomb. That theory changed. All I asked you, counsel, was whether the agent was the case agent. Was not the case agent. And I apologize, Your Honor. Okay. I would like to. How would you describe this person? This is a person. This is an agent who worked on the case? This is a person who will, I believe, testify at trial about the construction of the bomb. Well, you know, let me tell you frankly what my principal problem with your case is. Please. If anybody has an interest in confidentiality, it's the United States. I don't understand when the United States does not object, the actual people are not objecting, why you come along with your, we can't give it up. They don't care. Why should you care? Because the privilege belongs to America. I know, but why should you assert it? In this particular case, the material that the government has already through Brady and other obligations given to the defendant. Well, all right. But you're answering my question. What substantive interest is there on your part? Whose confidentiality are you protecting? It is a matter of principle for America's most wanted. I know, it's a great principle. We all believe in the principle, but the principle has got to have consequences. What's the consequence here? The consequence here is if in this case and in other cases like it were the same argument could be made. No, I don't know what the other case will be, but I should imagine wherever the government objects or wherever the witnesses object, that will be an issue. But that isn't the case. Do you have some case where the privilege was upheld when everybody involved said it's okay with us? Your Honor, we have. The journalist was just asserting it in the air. Your Honor, we have cited the cases, and on rebuttal I will give them the location in the brief, that the privilege does belong, in fact, to the journalist as opposed to the serious. Of course it belongs to the journalist. But apart from the wonderful principle, what else must be shown? But it's an important principle, Your Honor. It's an important principle. We all say I'm into the principle, but we've got to apply it to some set of facts that makes sense. And the problem is that if you do it once, the expectation will be bent again to do it again at another time. You can call that the slippery slope argument. It's a very poor argument. Your Honor, I will give that. Is it your argument, is it your client's argument, that the defendant, through Brady and other disclosures along the way of the criminal prosecution, is sufficient and that the material you want withheld is not necessary to the defense? Absolutely. Who made you the judge of that? No one made us the judge of it, but the question under 17C and under the reporter's privilege is whether or not it satisfies the tests there. What makes America Most Wanted and its producers think that their judgment about what's necessary to the professional prosecution or adequate defense of a serious criminal case is better than the parties? I think it is not their judgment. I think in any case, as here, it is the court's judgment, and the only substantive judgment you have on this is Judge White's comment to the defense counsel  But you've got the United States of America, which has what I take it is a serious prosecution on the line, and their position is that this material ought to be given to the defense. Their position, with respect, Your Honor, is that 17C has not been satisfied by the defendant. Ms. Bellier may speak to that, but their briefing is very clear in the previous argument to the Ninth Circuit on this. Their position is that 17C has not been satisfied by the defendant. Whether it's 17C has been satisfied or not, their position is that this ought to be withheld? Correct. Well, I will let them speak for it. Their position is that 17C has not been satisfied. But in any event, your client thinks that your judgment is about whether it's necessary for the defense is better than these people who are responsible for defending someone who's Can I finish? Yes. whose life and freedom is on the line. I don't mean to be flippant. I am not, Your Honor, when I say that in cases involving the reporter's privilege, it is, it goes through a process, and it goes through a process that is not designed to be, it is inherently designed to question whether or not the test of relevant specificity and admissibility and the more rigorous First Amendment test is satisfied. And that, that is done in every case and is not meant to cast judgment on anyone. It is meant to protect the corresponding First Amendment protections that apply in that case and in every other case. Isn't that the point of the in-camera inspection? It is. And although I don't think you would advocate, I don't think you've taken the position to advocate in-camera inspection. If we were to adopt that as part of the procedure, that would at least provide some measure of review and protection for balancing the First Amendment rights with the defendant's rights of due process. I think in this particular case, particularly with the undisputed change of facts and law that the judge applied with respect to the death penalty sentence, it is imperative and understood. Talk about that for a minute. Did the indictment change in any way? I do not. I believe the indictment may have changed with respect to the, to the details as to what Mr. Lin was said to have done. Did they go back to the grand jury and reindict? I believe that there was a second, I believe that there was a second proceeding, but I would have to look at the, I would have to look at the record to confirm that. And if I could, I have a minute remaining if I could save that for rebuttal. Thank you for your argument. Counsel? May it please the Court. My name is Daniel Blank and I represent David Lin. He is the defendant appellee in this case. Your Honors, there were two issues that were raised by my opponent, a 17C issue and a reporter's privilege issue. I respectfully submit that in light of the disclosure that they have made to us and to the government of the transcripts of the matter at issue, there is no longer a live 17C claim. And in fact, their appeal has to either stand or fall just on the reporter's privilege. What evidence do you plan to put on from this? Well, from this being the transcripts? Yes. Well, I don't know because I haven't read it in detail. You don't have any knowledge or plan right now to put on any of the evidence that you acquired, do you? Well, I know that the government is calling Stephanie Smith, the case agent, as a witness. And so I intend. I'm talking, well, go ahead. And I intend to impeach her if there is some basis to do so. And I would like to do so if she says anything different in the outtakes than she would say on the stand. How do you deal with fields in saying that gathering of impeachment evidence doesn't satisfy the standard? In two ways. First of all, that's a 17C issue. Yes. There is no 17C issue anymore because I have the transcripts because they gave it to me. All right. Well, assume that there is. Okay. For the purpose of my question. Okay. You're entitled to get impeachment evidence for 17C means, right? Well, that's not quite correct. I think that maybe as a general rule, but there are exceptions to that, and there are two cases, each cited favorably in the Schoen 1 decision that dealt specifically with outtakes. One is the LaRouche case, and one is the Cuthbertson case, the first Cuthbertson case. And Schoen 2 says you can't use impeachment, right? But I don't think it was overruling Schoen 1. It was just building on that. And even if that so that's the first argument is that there are cases that are relied upon. The second issue is that I would then just file a trial subpoena. I can use a rule 17 subpoena as a trial subpoena for impeachment material. I just can't use it as a pretrial. Right. So I would just reserve the subpoena. Yeah. I mean, you're asserting a 17C right. That's what the issue is before us. Assuming we get over the Putinist problems and so forth. And there's another problem with the disclosure is that the government has it as well. And now their disclosure rights under Jenks are triggered. And I don't think anyone is disputing that. I think that STF agrees, and they said so in their brief. They say it's premature. But once Ms. Smith testifies, the government is under an independent obligation to provide it to me. Would you agree that you had no information, no solid information prior to filing the subpoena, that something was said during the outtakes that would lead to exculpatory evidence or provide it? I have that belief now. And I think that I can articulate that. And the reason is that the theory of the prosecution has changed. And so I think it's likely that there are statements that were made by the acting U.S. attorney and or the case agent that are different than the theory that will be presented at trial. And to the extent that the government is committing itself to that, that's a statement of a party opponent. And I think it's appropriate. Do you have any reason to believe those statements were made in the outtakes by, say, a witness to the investigation, by the statements of the officer? Or are you just speculating? Well, they were not provided to me in a manner in which I was free to peruse them in detail. And the relevant government parties have not told me either what they were said. But the government has said, and I just want to correct the record in terms of what was said before, that they would give it to me if they had it. They said that on the record in the district court. So it's not a question of, you know, that they wouldn't or they couldn't. If they had it, they would give it to me. What do you mean you haven't had a chance to read it in detail? You've had it? I have it. When something which you think is so critical comes into your hands, you don't read it? Well, I take ethical obligations seriously. And what I did was when it was alerted, it brought to my attention that it was disclosed. I put it in an envelope and sealed it. But it is my intention. You didn't read it before you put it in an envelope? I didn't read it with the kind of care to know just more than what it was. You have a pretty good idea of what's in it. I mean, I think you're a very intelligent lawyer. You read something like that. I'm sure you fixed on what were the main points. Well, I think I would need more than main points and more just to know what it is in order to determine whether and how to use it at trial. And you were so conscientious you didn't make a single note. I didn't make notes. There was a copy that was made. I destroyed the copy. I put it in an envelope. But I do take the obligations that Your Honor is referring to very seriously. And although there may be some ethical obligations, and by the way, the California Supreme Court State of Law is entirely a mess, to maintain this, at least for now, I also have constitutional and ethical obligations to use them on behalf of my client. So there are very practical considerations that would govern this, and that's why the whole privilege issue is the only thing that's really relevant here. Well, let's assume America Most Wanted is about criminals. If we say it's just fine for you to use the Rule 17 subpoena to get this material in this case without any suspicion, any proof that there's anything in there, that's going to be routine, isn't it? Why wouldn't it be routine? In fact, I think defense counsel would be remiss if they didn't make a Rule 17 motion, serve a Rule 17 subpoena in every single case. Well, I understand the point that Your Honor is making. You're going to do it the next time you have it, aren't you? This is such a unique case, Your Honor. It is so unusual. And I have to say it was the subpoena itself was much broader in what it originally sought. And the balancing that was required occurred when Magistrate Judge Trumbull and then Judge White twice affirmed that in its limited format, just the speech of the government itself. And I think that's worth recognizing, too, is that the speech that we're talking about is official government speech by the parties in charge about an active criminal investigation. This isn't some case where we're trying to protect a whistleblower who's either the source of the information or their statement is confidential. This is something that's just out there government speech. There's really no First Amendment interest that can be identified in protecting this. So there are three different ways. What's wrong with having a judge look at it? Nothing. The judge did look at it. Yes. And if he says there's nothing relevant here. He didn't. He didn't say that. No, I know he didn't. But, I mean, for example, if we were to send it back, say let's do a thorough analysis and see if it meets the criteria, there's nothing wrong with that, is there? That's already been done three times, though, Your Honor. Well, he didn't make any findings. He just said it's a big nothing. You cast that as an offhand remark, and I think that's probably right. But I think it's probably a gut-level judgment that if he made findings, he would say it's not relevant. I think that it can't undermine the holding that the Court reached, which that it was relevant. If his holding was that it was not relevant, if it was a big nothing, then he could not give it to me. He would not say that I'm entitled to it. So I think the big nothing really is an offhand remark. It wasn't meant to be a, you know, a crystallized encapsulation of what the, you know, his holding was. His holding is there in the order saying we're entitled to it. But your Honor's concerned about the 17C issue, but I urge the Court not to reach that. There's no reason why this Court has to decide that tricky issue, because we have it. And there is they don't have to respond to the subpoena. We've already got it. So the only thing that would keep me from opening the envelope and engaging with it in the way that Judge Noonan suggested is the possibility of a privilege. And they have to overcome they have to demonstrate the privilege has not been overcome in three ways. The first way is, of course, the government's position, which is there is no privilege. Do you have the transcript? Do you want the tape? Well, you know, I would be willing to just, if I could look at the transcript, then I could say whether I needed the tape or not. Right. But it's still alive. So I may not need the tape. It's still alive, 17, Rule 17 issue as to the tape, isn't it? The outtakes. That's what you asked for. You didn't ask for the transcript. Well, we asked for both. Yeah. I mean, transcript alone is what I meant to say. Well, and if the Court wanted to make a distinction based upon the transcript versus the tape, we could do that. Are you abandoning your request for the tape now in front of us? No. I don't think it's necessary. It's not moot, is it? Your Honor is quite correct with respect to the tape. But anyway, with the privilege, they have to demonstrate the privilege has not been overcome for three ways. The first is that the government's position, there isn't a privilege. The second is, of course, the inadvertent disclosure. That they may have waived any privilege that they might have had by their inadvertent disclosure. I filed a motion to dismiss. The Court didn't invite more argument on that, so I'm not going to spend a lot of time on that. But I wanted to make sure the Court was aware of that. Who was the disclosure made to? Who wasn't it made to, Your Honor? It was made to my office twice, both to the San Francisco office and to the San Jose office. It was sent to government counsel, at least one copy. I understand it was also sent to the DA's office. So there are multiple copies that were distributed to, as I take it, every party. So it came into one of your secretaries? Exactly. And she brought it to you? No. What happened was, it's our routine practice, my routine practice, to have my secretary make a copy and have the original separately. So if I take notes on it, then I'm not making, messing up the original. But for whatever reason, and I think it was because the STF also faxed everything that I needed to me, and I started working off the fax copies, I didn't go to the copies that my secretary had made. But when I got a call from counsel saying he believed they had been disclosed, I went, and lo and behold, there was an original and a copy. Now, if you were denied this subpoena, do you say you couldn't get a subpoena at trial? I think I could get a subpoena at trial. And would that be a serious problem? I doubt it. I don't think it would be a serious problem. I mean, I think that before I applied for another subpoena, I would review the transcript and see if one was needed. You know, both sides seem to take this pretty seriously. And I have difficulty seeing what the interest of the journalist is when nobody wants to keep it confidential. I have some difficulty seeing what your position is when you can get the same thing at really no great cost if it's put off. I agree completely, Your Honor. I don't see what the interest is that they're defending, especially in light of the posture of the case in which I have it. No, but I mean, you're putting at issue the Rule 17 issues, the pretrial, when you have a remedy at trial. And there's a reason. There's a difference. I mean, if you could get a trial subpoena pretrial, the rules would provide for that. And you're saying, well, don't worry about it. We can get this later. So, therefore, we should ignore the rules concerning pretrial subpoenas? Well, no. Of course, the motion — Obviously, that's hyperbole, but that's kind of your position. Well, I think it is slightly hyperbolized, Your Honor. I'm not saying ignore the rules. There's nothing in the rule that says you can't get impeachment materials. There's a case that Your Honor cited, which is Fields, that says it's a general matter that's not appropriate. I've cited other cases in which it was appropriate. And the ones — Right. But Schoen says it's not appropriate, too. It's not just one case. It's Schoen, too. Well, Schoen, too, I don't think I read Schoen, too, as saying it's inappropriate. In fact, Schoen, too, engaged in an on-the-merits review of whether the impeachment material was appropriate in that case. Similarly, unavailing is Plaintiff's argument that Watkins states the notes are important to their case because they might provide valuable impeachment material. Right. And then, as I recall, Your Honor, you have it right in front of you, there were three or four paragraphs in which they go on to discuss it, whether the impeachment material was appropriate in that case. I see. So you make it a factual distinction. Correct. So if all they needed to do was say it is never appropriate, it would have been one sentence and a cite. And that's not what they did. I think in some cases impeachment material is appropriate. The two cases that I cited are factually very, very similar. They both dealt with outtakes from television shows. And both — and one of them, at least, I think the other one was unclear, but one of them was a pretrial subpoena, and it was all approved. That was the LaRouche case. So I think it's a much more factual-based analysis than Your Honor was suggesting that it's never impeachment that's never appropriate. All right. And to stand here right now, you don't know whether you're going to use anything or not. You want to see it and you want to decide. I don't think that that's inappropriate. I can't know. I mean, in fact, even if I could see it right now, I wouldn't know because I haven't seen the government's case. And what my defense is going to be, a defense is by its nature reactive. And I have to know what they're going to say. Maybe they will say — present the case in a way in which I won't need it. But there's an important issue that I also wanted to raise, which is that the judge is — Judge White has already granted my motion to admit certain evidence regarding the quality of the investigation in this case. The person who made the bomb, after being interviewed nine times by the police, fled, and he's now in Venezuela outside the reach of extradition. And it was after he fled that my client was arrested. And I have numerous, as you can imagine, criticisms about the quality of the investigation. So even if it were not apparent on its face, you know, a statement by either the case agent or the acting U.S. attorney, why that would be important to me in my defense, there may be something that's a little more subtle that I nevertheless need because the quality of the investigation is an issue that's going to be raised at trial. Is trial scheduled? January 23rd, Your Honor, which creates a bit of an urgency to resolve this matter. And I think that my duties of zealous representation will kick in in short order. I complied with the request to immobilize the transcript, and it is, and we would expect a ruling from Your Honors. But short of that, I think I will have to use it as necessary at trial. I had a motion to dismiss. It wasn't ruled on. That would have resolved the issue more quickly. But it is a short fuse. There is some possibility that the trial could get delayed. There's a possibility of another interlocutory appeal, this time from the government, based upon some eliminate rulings. But we're expecting the case that will go to trial on the 23rd. Thank you very much. Thank you for your argument. Rebuttal? Your Honor, two points. On the inadvertent disclosure, the timing, everything that happened, the precautions taken afterwards, the response, all of that is detailed in our declarations. But what I would point out, and Mr. Blank confirms it, is that no one relied upon that information. And most importantly, that includes the government. So there's no jinx obligation. They don't know whether it says anything for them or not. That's frankly a red herring. The issue is whether or not they relied on it and they changed their position as a result of it. And they have not. And there's also a court order. Those were given to the court specifically with a court order, pursuant to a court order. And as this Court considers this issue on the dismissal, but as it relates to the appeal itself, it must consider not only the precautions that were taken, the circumstances under which the disclosure took place, but most importantly, even when we were in the Ninth Circuit in this case arguing telephonically before the discovery, the motions panel, it was not known at that time. No one relied on it. No one relied on it for purposes of this briefing. It is a situation where the harm should not come. Why isn't official speech different, particularly in the context of a criminal investigation where the government is under obligations to provide all statements? Why isn't a speech by an investigator or a speech generically by investigators or those associated with the investigation made to you different from other speech used in your program? My time has expired. May I answer that? Sure. The difference is that the Brady obligation solves any concerns about the whether or not information is being withheld. It doesn't change the fact that it is still unpublished information. And the importance of that is set forth on page 41 and 42. There is a quote that explains the invidious nature of seeking unpublished information as well, even if the source wants to give it up in response to Judge Noonan's question, page 41 and 42 and the sites that are there. And what is your argument as to why you haven't waived the privilege by sending it out? Because it is not our privilege to waive. It is America's most wanted's privilege to waive. Whose privilege? It is our client's privilege to waive. And so you are representing the client. Correct. But I think what you do on behalf of the client and the cause of the case is their act. Is that your position, that they didn't do it because you did it? Is that really your position? My position is that they would have to have a ñ it would have to be a knowing waiver. And just in the context of the attorney-client privilege, it would not be a knowing waiver. Are you sure about that? You are knowing lawyers, and I assume you know what you're sending out. I really am skeptical about the client having to know what you're doing. They are in your hands. You did it. You may be very embarrassed, but you did it. And I am, Your Honor. And in particular, though, the question at this stage has to be if that was captured and it was within 15 minutes of the knowledge. No one has reviewed it. What did you do when you found out? I contacted counsel immediately. Within 15 minutes? I did. He had already gotten into his office and read it. No, he had not. He had not. He didn't ñ he did not know about this until after we called him and brought it to his attention. Well, he said he read it. He said he felt very conscientious about it. But he says he did read it. He said he read it, but not in a way that would implicate the privilege. Correct.  It was brought to our attention, and within 15 minutes it was contained. Who brought it to your attention? The Justice Department lawyer brought it to our attention after we argued in the Ninth Circuit. No one knew about it until then. But in the context of an attorney-client privilege, the privilege to waive is the client's, and if an attorney discloses material that might be subject to the privilege, we usually say that that's waived. That is true. Why should we view this as any different? This should be different in this particular context because of the nature of not only the protections taken to avoid this, but also what happened afterwards. What is really material is that there was no reliance on anybody's part on this. And if there wasn't any reliance, there wasn't a change of a position, and Mr. Blank has made that very clear. There really is no change from having received it and having received a call from me saying, you received something that you shouldn't. Please contain it. Do not read it, which is exactly what is presented to you here. Okay. Thank you. Thank you for your argument. Would the United States like to comment? Good morning. Barbara Vallier on behalf of the United States. Recognizing that I have a red light and also that we're a little bit of interlopers in the appeal here, I'd just like to state essentially two things. Yes, indeed, we agree with America's Most Wanted that the Rule 17 subpoena issue, that that's the basis of the reversal here because we do not think that on this ground that he ruled had a sufficient basis under Nixon to essentially grant to deny the motion to quash the subpoena. That said, if the Court were to disagree with that conclusion and agree with the district court that the materials were relevant or that the defendant met his burden under Rule 17, it's the government's view that here the rights of the defendant, if he met Rule 17, would trump those of any First Amendment rights of America's Most Wanted, and therefore he'd be entitled to the materials. So the bottom line at this juncture is that you do not want the material produced pursuant to Rule 17. That's correct, Your Honor. Okay. That's correct. What did your office do when you got that material when it was disclosed to your office? Your Honor, actually, the time in which we learned it had been disclosed was apparently it had been sent Federal Express to the San Jose office to the trial attorney, and he did not review the material per se because we had received the facts of the declaration. So he didn't realize there was additional material, which were the transcripts attached to it. In preparing for the brief to be filed in this case in the Ninth Circuit after we had argued the emergency motion. Well, who took the initiative? I did, Your Honor. I was reviewing the materials. I recognized as I looked at it. And you did that within 15 minutes or less of receiving it? Oh, yes. What happened was I was reviewing the materials. I saw on the top of one of the pages that it said transcript. I saw Mr. Shapiro's name, which alerted me to the fact that I may have the transcripts of the outtakes. I looked at the bottom of the sheet, and it did in fact describe that this was material that was not supposed to be disclosed to the defense, close the package, talk to the paralegal about how she had received it, and then we called America's Most Wanted to inform them that it had been disclosed to us. We put it in a package, and it's in a safe in our office. Okay. If there are no further questions. Thank you. Thank you. The case just argued will be submitted for decision, and the court will stand adjourned. All rise. This court for this session stands adjourned. Thank you.
judges: Noonan, Hawkins, Thomas